**In re Patrick Joseph EVANS, Debtor.**

**In re Angela Christine HUSS, Debtor.**

**Bankruptcy Nos. 92–16816S, 93–10441S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 11, 1993.

T.H. Maher Cornell, Berwyn, PA, trustee in both cases.

John D. McLaughlin, Jr., Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

This Opinion reflects the outcome of a consolidated hearing of March 25, 1993, to determine whether two entities established under the auspices of We the People, Inc. ("WTP") of Tampa, Florida, We the People Business Center ("WTPBC") and Legal Self–Help, Inc. ("LSH") (collectively WTPBC and LSH are referenced as "the Respondents"), are engaged in the practice of law and what actions this court should take as a result of their practices.

We find that the circumstantial evidence presented strongly suggests that LSH has been engaged in the unauthorized practice of law, as the United States Trustee ("the UST") argues. However, we find that the evidence conclusively establishes the conclusion that, if LSH's activities are as limited as it contends, that entity has grossly overcharged its customers. Based on this evidence and our conclusion that control of charges by such entities is in itself an issue of great import to this court, we will enter an Order preventing LSH from charging in excess of $100 to any debtor for its services in the future and directing it to refund all charges in excess of this amount to all customers obtained by LSH subsequent to February 10, 1993.

B. PROCEDURE AND FACTUAL HIS-
TORY

PATRICK JOSEPH EVANS ("Evans")
filed a Chapter 7 bankruptcy case *pro se* on
November 4, 1992. As required of all *pro
se* debtors by Local Bankruptcy Rule
("L.B.R.") 2016.1(c) of this court, the Debt-
or disclosed, on the requisite Local Bank-
ruptcy Form ("L.B.F.") 2016.1, that
WTPBC, located in Frazer, Chester County,
Pennsylvania, had charged him $150 for
assistance in preparing and filing his pa-
pers. On November 9, 1992, we issued an
Order requiring the Debtor and a represen-
tative of WTPBC to appear at a hearing of
December 3, 1992, to disclose to this court
what services WTPBC claimed to have per-
formed for Evans to justify the charges
imposed and why the sum charged should
not be refunded; and to provide to the
court the names of any other debtors and
bankruptcy numbers of any other cases in
which WTPBC charged fees to debtors for
filings in this and any other bankruptcy
courts.

Salvatore Sapienza ("Sapienza") ap-
peared on behalf of WTPBC at the hearing
of December 3, 1992, which was, at our
request, also attended by the Debtor and
John D. McLaughlin, Jr., Esquire, an Assis-
tant United States Trustee who apparently
has been delegated the duty of investiga-
tion of claims of unauthorized practice of
law by that office ("the AUST"). Sapienza
indicated that the Debtor had been his only
bankruptcy customer. He requested an op-
portunity for a further hearing at which he
expected to be represented by counsel sup-
plied by WTP, but he agreed not to accept
any more bankruptcy cases until this mat-
ter was resolved. The AUST expressed an
intention to imminently file pleadings chal-
lenging WTPBC's continued practice in the
bankruptcy area.

When no filing was made by the UST as
of February 10, 1993, this court entered an
Order that date in which we scheduled a
hearing to determine the propriety of
WTPBC's activities in bankruptcy cases on
March 25, 1993. In our Order, we request-
ed WTPBC to appear, presumably with
counsel, to explain fully the scope of its
advertisements, affiliations, services, mate-
rials utilized, and fee schedules.

On January 26, 1993, ANGELA CHRIS-
TINE HUSS ("Huss"), a resident of
Parkesburg, Chester County, Pennsylvania,
filed a Chapter 7 bankruptcy case *pro se*.
She disclosed on L.B.R. 2016.1, that she
had paid LSH, located in Lancaster, Penn-
sylvania, $250 for its assistance to her in
filing her bankruptcy case. We entered an
Order of February 8, 1993, which stated, in
pertinent part, as follows:

1. [LSH] is requested to voluntarily
suspend assistance to debtors and collec-
tion of fees pending resolution of the
propriety of its doing so.

2. It is directed that a responsible
person from [LSH] answer the following
questions in writing, ...

   a. What services have you performed
   for the Debtor to justify the charges
   imposed?

   b. Are you the same organization or
   related to the organization which has
   appeared before Chief Judge Twar-
   dowski [ ("C.J. Twardowski") ] regard-
   ing its practices in the past? ...

   c. Please provide the names of any
   other debtors and bankruptcy numbers
   of any other cases in this or other
   courts in which you have charged fees
   to debtors.

   d. Have you suspended your services
   in light of paragraph one of this Or-
   der?

3. Shortly after receipt of the an-
swers, a hearing may be scheduled which
the Debtor and a representative of [LSH]
may be required to attend.

LSH filed responses to the Order of Feb-
ruary 8, 1993, in which it declined our re-
quest to discontinue its services. Ultimate-
ly, it provided this court with a list of
eighty-eight (88) cases in which it had as-
sisted debtors in this court. It revealed
that it was the same organization which
had appeared before C.J. Twardowski in
the past, but that the instant case was the
first filed for a debtor in the Philadelphia
Division of this court, as opposed to its
Reading Division. After reviewing these
responses, submitted by John C. Bates

("Bates") for LSH, we entered an Order of February 26, 1993, in which we scheduled a hearing "to determine whether [LSH] does engage in the unauthorized practice of law and, if so, what action this court should take, and to determine whether its charges are reasonable for services it provides and, if not, what actions this court should take," also on March 25, 1993. We also stated in the Order that "[t]he court would like [LSH] to fully explain the scope of its advertisements, affiliations, services, materials utilized, and fee schedules at this hearing."

Sapienza and Bates both appeared *pro se*, and the AUST also appeared, per our request, at the March 25, 1993, hearing. We also learned that, on February 2, 1993, the AUST had filed several adversary proceedings in the Reading Division of this court, before C.J. Twardowski, which sought to enjoin LSH from the unauthorized practice of law in those and other bankruptcy cases and to have LSH refund all charges made to it by the respective debtors ("the Proceedings").

Sapienza initially took the stand and chronicled his experiences and ultimate disenchantment with WTP, particularly its failure to provide him (or Bates) with counsel in these proceedings despite their repeated requests for same. Sapienza testified that he had been, for many years prior to becoming involved with WTPBC, an officer and marketing director of a generic pharmaceutical company and that he had no legal training. After the hearing, he produced a Partnership Agreement of December 10, 1991, supporting his hearing testimony that WTPBC had been established by the formation of a partnership between Enza, Inc. ("Enza"), a corporation formed by Sapienza and his wife, and WTP Partners, Inc., an entity associated with WTP ("WTPP"). Enza was required to contributed $40,000 to this enterprise. In return, WTPP allowed WTPBC to use the WTP name and advertising; agreed to provide WTPBC with legal assistance; and provided WTPBC with access to document preparation in a business center which would handle not only legal matters such as divorces, wills, incorporations, copy-rights, immigrations, and of course bankruptcies, but also income tax preparation, mailbox rentals, postal services, bookkeeping services, preparation of resumes, and a travel agency.

With respect to bankruptcies, Sapienza stated that $149 was the charge recommended for his services by WTP, and therefore what he had charged to Evans. He also stated that he was obliged to remit thirty (30%) percent, or $44.70, pursuant to the Partnership Agreement, from any charges made on bankruptcies to WTP at its headquarters in Tampa, Florida, where the typing was performed. WTP broke this charge down as follows:

$25.00 electronic transfer out
$25.00 electronic transfer in
$35.00 WTP Bankruptcy Booklet
$10.00 out of state handling fee
$54.00 Typing Fee

Sapienza questioned the accuracy of this breakdown, although he recited it in one of his submissions to this court at WTP's request.

At the court's request, Sapienza produced video tapes of television news stories relating to WTP, which were given to him by WTP as an inducement to enter into the Partnership Agreement. The tapes feature references to WTP's drive-in services and its "mobile divorce van." *See* M. Kreiter, *Mobile Divorce Van Hits Road Nationwide*, Legal Intell., April 7, 1993, at 1, col. 1. The tapes stated, at one point, that WTP charged $89 for bankruptcy services delivered its home office in Tampa.

In describing the bankruptcy services which he provided to customers, Sapienza stated that he loaned customers a book, S. ELIAS, A. RENAUER, & R. LEONARD, HOW TO DO YOUR OWN BANKRUPTCY (3rd nat'l ed. 1991), which is published by Nolo Press, Inc. and was hence referred to as "the Nolo Book," for a deposit of $25.00, its approximate purchase price. The deposit was returned unless the Nolo Book were not returned or were marked up by the customer.

Sapienza also testified that, even prior to the court's involvement, he was not inclined

to emphasize bankruptcy services at WTPBC. He stated that he had made referrals of all but one of his potential bankruptcy customers to attorneys. The presence of Evans, his only bankruptcy customer, was attributed by Sapienza to Evans' own persistence in wanting to utilize his services. Although he declined the court's invitation that he could forego the hearing and be absolved from any liability if he agreed not to handle any future bankruptcies at the hearing, Sapienza had a change of heart and stated a willingness to refrain from accepting future bankruptcies in his post-trial submission.

Bates, a native of England who is the sole proprietor of the recently-incorporated LSH, took the stand after Sapienza. Like Sapienza, Bates' activities were attributable to an arrangement with WTP in Tampa. However, Bates' agreement with WTP, documented by a Purchase Order of April 29, 1991, was much more advantageous to his interests than the arrangement of Sapienza with WTP. For a payment of but $22,000, Bates had purchased, from WTP, its software for bankruptcy, as well as that for divorces, wills, trusts, corporations, immigrations, powers of attorney, and such additional businesses as mortgage brokering, a travel agency, and student financial assistance. Also included in the package of benefits from WTP to LSH were training services, "fee-based legal advice to clients on a call-in basis," and legal defense where its proceedings were challenged.

Perhaps because it was apparent, in contrast to the business of WTPBC, that bankruptcies were a very significant portion of LSH's operations, Bates was much more guarded in his presentation and answers to questions than Sapienza. However, in no respect, including his disappointment that WTP failed in its perceived commitment to provide legal assistance to him in these proceedings, did Bates contradict or take issue with any factual assertions made by Sapienza.

Bates described his profession and training as a mechanical engineer. He testified that he married an American woman and then settled in the United States in 1979. Like Sapienza, he had no claim of any legal training or experience prior to his venture with WTP.

LSH's operations reflected a much more aggressive advertising strategy than WTPBC. For example, LSH is listed in telephone yellow-page directories under "ATTORNEY REFERRAL SERVICE" and "LAWYERS SERVICE BUREAUS." The former heading is shared only with a much more modest entry by the Lancaster Bar Association.

However, the basic materials utilized by LSH are, like those utilized by WTPBC, the WTP workbook and the lending of the Nolo Book to customers for a $25 deposit.

The AUST pressed Bates at length for a description of precisely what method of operation he utilized in providing services to his many clients. Bates testified, in response, that, in the initial consultation, usually lasting about a half hour, he attempts to obtain half of his prescribed fee ($125), reviews the WTP workbook with customers, and lends them the Nolo Book. When the workbook is returned, he collects the remaining $125 and reviews the worksheets, which usually takes about a half hour. Thereafter, he prepares the final bankruptcy papers using the WTP software, which usually takes him 60 to 90 minutes because he is reportedly a poor typist. The finished product is then copied and returned to the customer for filing. Additional pleadings, such as lien avoidance motions, answers to motions of creditors for relief from the stay, and on one instance an adversary complaint seeking a discharge of a student loan, are also prepared and are covered under the one-time $250 charge. However, Bates stated that he expected to shortly change his fee schedule to request additional payments for preparing such additional documents.

Bates was adamant in contending that, in his discussions with his customers, he never provided legal advice to debtors. He contended that his procedure was to type onto the forms whatever was put on the worksheets unless it was clearly incorrect and to refer customers with legal questions

to two sources: (1) the Nolo Book; or (2) Tele–Lawyer, a service which he stated is run by the National Association of Independent Paralegals ("the NAIP") and charges $3.00/minute for consultations with lawyers. In purported support of this position, he submitted a copy of an Acknowledgement of Receipt and Approval of Document form which includes the following paragraph:

> I further state that I have received no legal advice whatsoever from "Legal Self–Help" or any of its employees and I have understood at all times material hereto that I am not utilizing the services of an attorney-at-law but am representing myself "pro se."

Although excessively disavowing his own legal knowledge or experience, and disclaiming that he identifies himself as a paralegal, Bates stated that he was a member of the NAIP and prominently disclosed same on his business card.

Faced with testimony from Sapienza which preceded his own which established that his cost structure significantly exceeded WTP's own recommended level, as well as the charge actually made to Evans by WTPBC, Bates presented several arguments to support the quantum of his fees charged. Firstly, he claimed that he was "making a loss" when he charged "only" $175 per case, and, therefore, "progressively in steps," he raised his price for bankruptcies to its present level of $250. Secondly, he argued that the $250 figure was well below the "market rate" charged by attorneys to handle Chapter 7 cases in his area. Thirdly, in his post-trial submission, he justified his fees with the following assertions:

3. FEES:

a. The fee that a similar service (Paralegal Associates, Inc.) charges attorneys to type their documents is $125.

b. The additional costs for selling retail, compared with selling wholesale, include advertising (informing potential customers of the service) are something over $500 per month attributable to bankruptcy. At 7 customers per month this is $71+ each.

c. Familiarizing customers with the reference materials. Average time 45 minutes ($38 at $50 per hour).

d. Provision of these reference materials.

e. Cost of the books, I have bought 19 books at almost $20 each; this averages out at over $5 per customer.

f. General and administrative expenses.

g. Checking questionnaires for omissions and to ensure that they are legible, say 15 minutes ($12).

h. Typing lien avoidance documents when requested.

i. Wasted time due to customers not showing up for appointments.

j. Having customers check the documents and acknowledge that they are correct, say 15 minutes ($12). Fair value $263+

General typing services in the Lancaster area charge between $20 and $25 for the first page plus $5 to $15 per page thereafter. (The Write Type, The Wordsmith, Typing Etc., The Communications Center).

Taking 45 pages as an average length of a petition the cost for typing alone, excluding provision of materials $240 and $680.

In this area typing paralegals charge up to $75 per hour (N.F.P.A.). To type petitions manually takes approximately 3½ hours, clearly this time is reduced if a computer is used, however [sic], the cost of the computer, software, printer, training etc. must be amortized.

After completion of the hearing, we accorded the AUST and the Respondents until April 2, 1993, and April 9, 1993, respectively, to render post-trial submissions. The AUST confined his argument to the issue of whether the Respondents were engaged in the unauthorized practice of law. He argued that WTPBC should be acquitted of this charge, with the stipulation that it disgorge compensation received in excess of a reasonable per page typing fee, which he calculated as 35 pages at $2.00/page, or $70.00.

However, with respect to unauthorized practice of law by LSH, the AUST argued as follows:

the testimony of [Bates] clearly establishes that his services go far beyond what is acceptable for an unlicensed person. He testified that he meets at length with his customers both for the "initial consultation" and for the review of the finalized documents. While he vociferously denies giving legal advice, he does admit to doing some editing of data submitted to him for typing. He also testified that he listens to the customers [sic] tales of [financial] woes. The UST submits that in the context of these discussions, it is highly probable that [Bates] may have made comments to the debtor that the debtor construed as being in the nature of advice form a person who appears, based upon his advertising and the circumstances of his business, to be knowledgeable in bankruptcy related matters. Even if no formal advice were given, the customers may be lulled into a sense of well-being that they are doing the right thing to rectify their debt problems. There is a strong probability in these situations that the customer's expectations of [LSH] services may far exceed what [LSH] can or even offers to deliver....

The various forms of relief suggested by the UST were an injunction against the unauthorized practice of law by both LSH and WTP and an order that all compensation received from all of LSH's customers be disgorged by both LSH and WTP.

Bates attached, to his responsive submission, twenty-one (21) replies to a self-made and self-distributed questionnaire allegedly given to certain of his customers. In the anonymous replies, all of the respondents to the questionnaire, which constituted less than a quarter of LSH's total 88–member clientele, stated that they were aware that nobody at LSH is a lawyer and that they did not receive legal advice, as well as all stating that the charges were fair, less than they could find elsewhere (obviously they were unaware of WTPBC), and that LSH was an "asset to the community." Some of the comments added which re-emphasize the foregoing are quoted, *e.g.*, the following choice example of "lawyer-bashing:"

Before they crucify you they should spend their time cleaning up the lawyers who work amongst themselves, drag things out to raise prices and charge outrageous prices in the first place.

Less supportive of LSH's contentions are the following excerpts from the anonymous and presumptively hand-picked submissions from less than a quarter of its clientele:

Mr. Bates was very helpful in showing me how to write up forms and gave me a book to read on how to file for bankruptcy. His service consisted of providing & processing forms. I could not have done this without his guidance, ...

... when a question came up he [Bates] sent me xeroxed copies concerning the subject, thus supplying me knowledge, but not legal advice. The price for his services seemed high at the time, but cheaper than an attorney.

... I appreciate the help in filling out the necessary paperwork to file bankruptcy....

John Bates gave us excellent assistance in filling out our bankruptcy papers....

A public policy defense is presented by LSH, *i.e.*, that it is providing a necessary service to consumers who have no other comparably low-priced service to which to turn. This issue is also implicitly raised by many of the comments on the replies to LSH's questionnaires.

Also emphasized by LSH are the following arguments: (1) The name LSH suggests that the business does not practice law and signs in the office and statements to customers to that effect were noted; and (2) the language in the AUST's submission, *see* page 965 *supra* ("may have made comments," "customers may be lulled," "strong probability," etc.) reflects that the AUST is unable to prove his assertions that LSH is engaged in the authorized practice of law by the allegedly-relevant standard of "beyond a reasonable doubt."

## C. DISCUSSION

### 1. IT IS APPROPRIATE FOR THIS COURT TO REVIEW THE PRACTICE AND CHARGES MADE BY LAY ADVOCATES.

■ We begin from the premise, which the UST assumes and the Respondents do not contest, that it is highly proper for this court to regulate the practices and compensation of lay advocates as well as attorneys who practice before it pursuant to 11 U.S.C. § 329 and Federal Rules of Bankruptcy Procedure 2016 and 2017. *See In re Fleet*, 95 B.R. 319, 337–38 (E.D.Pa.1989) (FULLAM, J.) (*"Fleet I"*). *Accord, In re Glad*, 98 B.R. 976, 977 (9th Cir.BAP 1989); *In re Harris*, 152 B.R. 440, 446–47 (Bankr. W.D.Pa.1993); *In re Minchew*, 150 B.R. 275, 277 (Bankr.N.D.Fla.1992); *In re Herren*, 138 B.R. 989, 995–96 (Bankr.D.Wyo. 1992); *In re Webster*, 120 B.R. 111, 114 (Bankr.E.D.Wis.1990); and *In re Bachmann*, 113 B.R. 769, 774–75 (Bankr. S.D.Fla.1990).

Many recent cases have imposed limits on permissible charges by typing services or other lay-advocate entities. *See In re Calzadilla*, 151 B.R. 622, 628 (Bankr. S.D.Fla.1993) (en banc) ($175 allowed, $355 ordered returned to debtor by clinic which performed broad range of services for clients); *Minchew, supra* (legal secretary allowed $60; $360 ordered returned); *In re McCarthy*, 149 B.R. 162, 167 (Bankr. S.D.Cal.1992) (value of paralegal and secretary services found to be $53.75; all compensation ordered disgorged); and *Bachmann, supra*, 113 B.R. at 775–76 ("paralegal" ordered to return $50 from $110 collected, which sum was found to be in excess of the reasonable fee of $60 for selling and typing bankruptcy forms).

We strongly believe that this court's failure to monitor lay advocates would create potential for havoc, which is perhaps most graphically illustrated by the proliferation of "bankruptcy mills" in southern California, to which about 30,000 1992 bankruptcy filings were attributed. J. Meyer, *17 Charged with Bankruptcy Fraud Involving Tenants*, L.A. Times, Dec. 19, 1992, at B1, col. 1. This court deems it highly appropriate for it to act before comparable entities improperly gain any foothold whatsoever in this district.

### 2. THE CHARGES IMPOSED BY LAY ADVOCATES INVOLVED IN BANKRUPTCY CASES MUST BE A SIGNIFICANT AREA OF INQUIRY BY BANKRUPTCY COURTS.

As is noted *supra*, the principal argument of the UST, in its post-hearing submissions, is that this court should focus principally, if not exclusively, on the issue of whether LSH is engaged in the unauthorized practice of law in providing its services. Since the UST alleges that LSH, despite and perhaps partially because of its excessive protestations, *is* in fact engaged in the practice of law, the UST argues that all of its practices should be enjoined. The illegal act of engaging in unauthorized practice of law is, per the UST, justification in itself for requiring LSH, as well as its mentor and creator, WTP, to return all of the fees which LSH has collected from its clients throughout the operation of its business.

The analytical approach presented by the UST is supported by much of the case law. In *Bachmann, supra*, 113 B.R. at 772–74, the court suggests that bankruptcy courts should look to the law of their respective forum states for authority on the issue of what constitutes the practice of law; then, if unauthorized practice is found, they should require the unauthorized practitioner to return any sums collected in this practice to their debtor-victims. *Id.* at 774–75. *See also McCarthy, supra*, 149 B.R. at 165–67; *Herren, supra*, 138 B.R. at 994; and *Webster, supra*, 120 B.R. at 113–14.

This analysis was followed in several cases involving the practices of lay advocates which have arisen in Pennsylvania, *e.g., Harris, supra*, at 443–46; *O'Connell v. David*, 35 B.R. 141, 144 (Bankr.E.D.Pa.), *modified on other grounds*, 35 B.R. 146 (E.D.Pa.1983), *aff'd*, 740 F.2d 958 (3rd Cir. 1984); and *In re Arthur*, 15 B.R. 541, 544–47 (Bankr.E.D.Pa.1981).

Pennsylvania law concedes that the boundaries of unauthorized practice of law are "necessarily somewhat obscure," *Shortz v. Farrell*, 327 Pa. 81, 84, 193 A. 20, 21 (1937), and that making out a claim of unauthorized practice is an "elusive, complex task 'more likely to write criticism than to achieve clarity,'" *Dauphin County Bar Ass'n v. Mazzacaro*, 465 Pa. 545, 553, 351 A.2d 229, 233 (1976), quoting *Shortz, supra*, 327 Pa. at 84, 193 A. at 21. However, the pertinent authorities have held that the unauthorized practice of law includes (1) instructing and advising clients in regard to the applicable law. *Id;* and (2) preparing documents requiring familiarity with legal principles beyond the knowledge of laypersons. *Id.;* and *Childs v. Smeltzer*, 315 Pa. 9, 13–14, 171 A. 883, 885–86 (1934).

The facts of *Harris* and *Arthur* presented relatively straightforward instances of unauthorized practice of law. The lay advocates in those cases apparently conceded (possibly as a perceived justification for their charges) that they both instructed clients regarding bankruptcy law and produced documents necessary for their clients' bankruptcy filings. *Harris, supra,* at 442–44, 445–46; and *Arthur, supra,* 15 B.R. at 544, 547.

The cases arising in other jurisdictions in the bankruptcy context have identified the following activities as the practice of law in bankruptcy matters: (1) determining when to file bankruptcy cases. *Herren, supra,* 138 B.R. at 995; (2) filling out or assisting debtors in completing forms and schedules. *Glad, supra,* 98 B.R. at 978; *McCarthy, supra,* 149 B.R. at 166; *Herren, supra,* 138 B.R. at 993–94; *Webster, supra,* 120 B.R. at 113; and *Bachmann, supra,* 113 B.R. at 773–74; (3) advising debtors regarding the exemptions which they should claim. *McCarthy, supra,* 149 B.R. at 166–67; *Herren, supra,* 138 B.R. at 995; and *Webster, supra,* 120 B.R. at 113; and (4) preparing motions and answers to motions. *McCarthy, supra,* 149 B.R. at 166; and *Webster, supra,* 120 B.R. at 113.

Without in any way questioning the legal analyses and results in these cases, we believe that there is another very important reason why the activities of lay advocates should be scrutinized by bankruptcy courts which is relevant here. That is to make certain that such services are not charging their customers more than their services are worth. We also add that there may be other reasons for scrutinizing the operators of lay advocates, such as protecting debtors from the consequences of incomplete and/or misleading legal advice, which are not raised in the arguments of the AUST or supported by this record but which could, upon scrutiny, well be found to exist among the cases handled by LSH.

In support of our view that scrutiny of lay advocates' fees must be among due issues of utmost concern to bankruptcy courts is our observation that our primary mission is to administer cases for the benefit of debtors and their creditors. It is in service of this mission that this court concerns itself with the activities of all of those who purport to assist debtors in this court and their creditors. One of our important concerns in our investigation of the practices of lay advocates, *sua sponte* if necessary, is to determine whether lay advocates purporting to assist debtors are not themselves in fact additional vulture-predators who will siphon off funds of debtors better spent on paying debts and/or assuring that the debtors have resources to enjoy the best possible quality of life in their "fresh starts."

Consequently, this court must often focus on the financial aspects of the practices of those who claim to serve debtors. It is prevention of profiteering at the hands of debtors and misuse of the Bankruptcy Code by lay advocates which often drives this court in those actions, not concern over the important but nevertheless difficult abstract question of whether an individual is improperly "practicing law."

█ These principles are consistent with this court's belief that fee applications of attorneys and other appropriate players in the bankruptcy process must be subject to *sua sponte* scrutiny by the court as well. *See e.g., In re Delaware River Stevedores, Inc.,* 147 B.R. 864, 868–70 (Bankr.E.D.Pa.

1992) (bankruptcy court must always review hourly rates charged by professionals); *In re Rheam of Indiana, Inc.*, 137 B.R. 151, 155–59 (Bankr.E.D.Pa.), *rev'd on other grounds*, 142 B.R. 698 (E.D.Pa.1992) (bankruptcy court has power and duty to review all fee applications *sua sponte* ); *In re Leedy Mortgage Co.*, 126 B.R. 907, 914–16 (Bankr.E.D.Pa.1991) (bankruptcy court has the power and duty to review trustees' compensation requests *sua sponte*, even when the UST makes no objections thereto); and *In re Patronek*, 121 B.R. 728, 731–35 (Bankr.E.D.Pa.1990) (bankruptcy court properly establishes maximum fee ranges for routine consumer bankruptcy cases). As we stated in *Delaware River Stevedores, supra*, 147 B.R. at 869–70:

> We continue to believe that no less than the integrity of the bankruptcy system and, ultimately, the entire court system, is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications *sua sponte*. The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law. We frequently read in newspaper stories that the public has a perception that bankruptcies are too expensive and that high professional fees are a significant cause of these high expenses. Nothing better serves to allay these perceptions and fulfill public expectations than the recognition that a bankruptcy judge, before a fee application is approved, is obliged to carefully review same and find it personally acceptable, irrespective of the (always welcomed) observation of the UST or other interested parties.

We agree that LSH's claims that it is filling a void created by pricing on the part of bankruptcy practitioners are not frivolous. We have observed an escalation in pricing by some practitioners which has not always been accompanied by higher quality services and the ability of debtors to pay. However, we believe that *sua sponte* court scrutiny of lawyers' fee applications is the appropriate response to any attempted unreasonable price escalation in consumer cases and that *pro bono* services by the local bankruptcy bar legislation permitting *in forma pauperis* bankruptcy filings must be established to handle cases of low-income persons who cannot pay even the most reasonable attorney's fees. The appropriate response is not the indulgence of alternative services which are themselves overpriced.

Our focus here, in this record, on the value and pricing of services by non-attorneys, as opposed to the nature of their services is the practice of law, is therefore not inappropriate and has precedent. In the *Fleet* case, cited *supra*, per the decisions reported at 103 B.R. 578 (E.D.Pa. 1989), this court ultimately ordered that over $235,000 be refunded and awarded to consumers by a bankruptcy referral service. The misconduct of the service was not the unauthorized practice of law: in fact, it referred its customers *to* lawyers. Rather, the causes of action against it were based upon its misleading consumers and overcharging them in the amounts of $195 to $260 for worthless referrals. *See Fleet I, supra*, 95 B.R. at 332–37.

Similarly, in *In re Watson, Bloodsaw, & Crawly*, Bankr. Nos. 91–13002S, 91–15278S and 91–15279S, 1991 WL 269989 (Bankr. E.D.Pa. Dec. 12, 1991), we enjoined the self-designated Consumer Advocate Association from performing any further bankruptcy-related activities when we discovered that it was charging its customers between $250 and $450 for making "face sheet filings" of cases for consumers, which cases were almost uniformly thereafter dismissed for failures to file other necessary papers or pay filing fees. In so doing, we were not particularly concerned about whether this business, whose operations resembled those of California "bankruptcy mills," was purporting to practice law. Our only concern was that their services were grossly overpriced and were therefore increasing rather than abating the economic plights of their customers.

On the other hand, this court is not particularly concerned about individuals and community-based organizations which provide services constituting a broad range of advice to indigent debtors in bankruptcy

matters for free or at nominal charges. In such instances, the individuals or organizations appear in fact to be legitimately filling a void due to unavailability of services at costs which indigent persons, such as public housing tenants, are able to pay. As long as no element of profiteering is evident, this court does not plan to intervene in such practices. Whether such practices can or should be enjoined at the initiative of bar associations and whether quality-control of such operations should be monitored are important issues, but not ones which this court is inclined to generally raise *sua sponte.*

3. LSH IS OVERCHARGING ITS CUSTOMERS FOR ITS SERVICES AND MUST BE PREVENTED FROM DOING SO.

■ The UST argues that LSH and WTP are, despite LSH's protestations, involved in providing many of the services which the caselaw has determined constitute the practice of law, *see* pages 966–67 *supra,* thus justifying the relief of an injunction against their continuing to do business and disgorgement of all fees charged by them.

We agree that the record is suggestive of the fact that LSH engages in the services deemed, in the caselaw, to constitute unauthorized practice of law. It does appear that LSH participates in its customers' decision as to when a bankruptcy is filed; that it does at least edit and assist debtors in preparing schedules and other documents; that it does provide advice regarding exemptions; and that it occasionally prepares motions, answers, and, on one occasion, prepared an adversary complaint for its customers. The questionnaire responses quoted at page 965 *supra,* although quite possibly hand-picked by Bates to avoid responses supportive of claims that it is practicing law, indicate that Bates provided indispensable "guidance," selected potential passages from the Nolo Book in responses to questions, filled in forms for customers, and gave them assistance in so doing. These activities appear to constitute the unauthorized practice of law. Bates' public disclaimers that LSH is providing legal advice are contradicted by his

pronouncement of his affiliation with the NAIP, which is highly suggestive that he claims to be a "paralegal;" and by his advertisements which make LSH appear to be, listed as it is with the Lancaster Bar Association as an alternative attorney or lawyer referral service, which is highly suggestive of a promise to provide legal services to the clients. The credibility of Bates, in his almost obsessive denials of engagement in the practice of bankruptcy law is, ultimately, simply not very convincing.

We do not agree with LSH's argument that the burden was upon the UST or the court to show, "beyond a reasonable doubt," that it engaged in the practice of law. This standard of proof would apply to a criminal proceeding in which the conviction of Bates or LSH for engaging in the unauthorized practice of law were sought, pursuant to 42 Pa.C.S. § 2524. However, the standard of proof in a civil, remedial action by the bankruptcy court should not be nearly that high. Particularly if the relief provided is mainly a prospective injunction against improper activities by lay advocates, we believe that the court would need only a reasonable suspicion of illegal or inequitable conduct on the part of a lay advocate to act.

However, we do agree that the evidence is inconclusive as to whether and to what extent LSH practices law or provides quality services to its clients. However, as our discussion at pages 967–69 *supra,* indicates, this inquiry is not the exclusive means by which this court may achieve its goals in regulating the practices of lay advocates.

By way of contrast, if we accept the testimony of Bates regarding his passive role in the service-delivery process as accurate, and we consider the evidence in the record, the conclusion that LSH is grossly overcharging its clients is overwhelming. Therefore, this court has ample evidentiary support, on this record, for the entry of an Order which will serve its proper role of preventing unconscionable profiteering from debtors and their creditors by a lay advocate.

According to Bates, all that LSH does is provide a workbook and a reference book to its customers and then proceeds to type bankruptcy documents as they are presented by the customers on a computerized word-processor. According to Bates, LSH renders no legal advice whatsoever and rotely types up materials for consumers which they prepare on the basis of consultations of the workbook, the Nolo Book, and, occasionally, "Tele-Lawyer."

We find that such services have very little value, despite LSH's efforts to establish same, mostly by unproven assertions which are not of record and appear intuitively improbable. Provision of the WTP workbooks is of doubtful practical benefit. The workbooks are not much simpler and easier to understand than the official bankruptcy forms themselves. Costs for marketing of LSH's "product" and charges for administration of LSH's one-person operation are difficult to understand. We can accept the value of renting the Nolo Book at $5.00. But we do not accept the accuracy of the figures in which Bates has claimed that the value of his services is in the range of $38 to $50 an hour. Many trained and skilled legal secretaries would be happy to earn $20 per hour for their services. Moreover, producing forms on a word-processor is not the equivalent of a legal secretary's common fare of varied tasks, nor of typing a page of materials from scratch. We have no way of knowing whether the UST's estimate of typing costs at $2.00 a page is any less accurate than LSH's estimates of up to $15/page.

We do know this. Bankruptcy forms and other pleadings, except for the mailing matrix, *do not have to be typed at all.* Most *attorneys* submit handwritten schedules, petitions, and other forms, in this court. It is therefore not accurate to assume that handwritten submissions are unusual or less likely to be found acceptable to the court than typed materials. A handwritten pro se document which includes pertinent information instead of empty, typed boilerplate is usually given, if anything, more attention than an attractive but vacuous formal pleading. Copying charges are generally less than 10¢/page. Moreover, most bankruptcy forms come supplied with carbon sets which a debtor could easily simultaneously fill out and copy by hand. We doubt that LSH advises its customers that attractive typing and reproduction of bankruptcy forms is in fact a luxury item which a truly cost-conscious bankruptcy debtor could easily avoid.

Furthermore, the unbiased evidence presented by WTPBC and Sapienza is itself almost conclusive in establishing that LSH is overcharging its customers for the particular service purportedly delivered. WTPBC is charging $149 for almost precisely the same service package that is provided by LSH for $250. The charge recommended by WTP for the typing portion of the services, which are performed in Florida, is $44.70. This charge includes mailing and handling costs which LSH, having a word-processor on site, can avoid. Although WTP itself apparently now recommends that its out-of-state affiliates charge $149 for the services which these affiliates provide, the video tapes submitted by Sapienza indicate that WTP's Florida home office, which operates similarly to LSH, charges only $89 for its bankruptcy services.

Also relevant are the values placed on comparable services in other jurisdictions, as noted in the cases cited at page 966 *supra. Minchew, supra; McCarthy, supra;* and *Bachmann, supra,* value comparable typing services at between $50 and $60. The *Calzadilla* decision, also cited *supra,* takes into account the additional services provided by the lay advocates in issue, and includes an injunction prohibiting these parties from engaging in such practices in the future, effectively reducing their future charges to zero. 151 B.R. at 628.

■ Therefore, on the basis of the instant record, we conclude that LSH is providing services to its customers which are valued at no more than $100. Since LSH has declined this court's invitation to voluntarily discontinue handling bankruptcies during the litigation of its propriety of doing so, we find that nothing short of an

injunction is necessary to prevent it from imposing such charges in the future. We also note that Bates appeared before C.J. Twardowski on a rule to show cause regarding the nature of his activities in the past. Bates testified at the March 25, 1993, hearing that he interpreted the fact that C.J. Twardowski did not enter an explicit order preventing him from performing his services as an implicit approval of his continued performance of such services. We seriously doubt that C.J. Twardowski made any statements, in the proceedings before him, which could have reasonably been interpreted as exonerating LSH from further court scrutiny. However, we will leave rectification of any such "misunderstanding" to C.J. Twardowski in his consideration of the Proceedings.

In light of the foregoing history of LSH's persistence in its activities despite warnings of their impropriety, at least by this court, we conclude that an injunction preventing LSH from charging more than $100 to any customers in the future must be entered.

Several other comments on the types of relief to be provided are deemed warranted. The UST requests that LSH and WTP both be directed to disgorge all fees collected by LSH from its customers. We note that this record, particularly the testimony of Sapienza, strongly suggests that it would be equitable to sanction WTP for its role in LSH's activities. It appears that WTP has not only breached its undertakings to Sapienza and Bates, but has led both its own affiliates, such as Sapienza and Bates, *and* their customers down a primrose path covered with thorns. We strongly condemn WTP's practices, which have clearly encouraged profiteering at the expense of needy debtors and their creditors.

However, WTP was not made a party to the proceedings of March 25, 1993, nor was it provided notification that *its* practices were at issue. Indeed, WTP's role in both of these businesses became clear only at the hearing. In our view, due process considerations therefore preclude us from providing any relief against WTP at this time.

With respect to disgorgement of fees collected by LSH, we will mold the remedies to the course of these proceedings. In its Order of February 8, 1993, this court expressly requested that LSH voluntarily refrain from assisting debtors in future bankruptcy filings pending the outcome of these proceedings. This Order was undoubtedly received by LSH as of February 10, 1993. Therefore, as of February 10, 1993, if not earlier due to the tenor of the proceedings before C.J. Twardowski, Bates was aware that the propriety of his practices was in issue and that he was susceptible to sanctions if he persisted in them. We therefore conclude that, in all cases in which LSH provided services to customers after February 10, 1993, it must be compelled to disgorge any fees charged and collected in excess of $100. We also believe that all of LSH's customers should be provided with notice of this court's views as to the propriety of LSH's services in order that they can decide whether they wish to pursue refunds from LSH as well. We will therefore order that LSH provide all of its past, present, and future customers with copies of this Opinion and Order. Also, our Order will direct that LSH promptly account to this court and the UST for changes made to customers obtained after February 10, 1993, and that LSH make the appropriate refunds to these customers as soon as possible.

We also must express several caveats in entering this Order. We emphasize that our within decision is made solely on the basis of the record made on March 25, 1993, and is not to be read as limiting the findings which could be made on other records regarding LSH's alleged unauthorized practice of law, the quality of LSH's services, or the remedies available to all of their customers against LSH or WTP in other actions in this court. Specifically, we make no assurances regarding what will transpire on the basis of possibly fuller records made in the Proceedings before C.J. Twardowski or any other attempts of LSH clients or the UST to obtain refunds or other recourse against LSH's activities. We are also not precluding Huss, upon her personal motion for same, from obtaining a

refund from LSH. However, no request for such relief has been made by her to date. We have therefore granted only that relief which we deem appropriate on the instant record.

We also note that our Order directs that no relief is provided against WTPBC. Since it has voluntarily ceased its bankruptcy-related activities, injunctive relief against that entity is neither necessary or appropriate. We are not prepared to *sua sponte* provide any relief to Evans. As in the case of Huss, we will leave the initiative of such an action to him, with our statement that disgorgement of any charges made to him by WTPBC in excess of $100 would also appear to be in order.

### D. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.