In re Betty Jane WAGNER, Debtor.

In re Richard Allen Yeakley, Debtor.

In re Eric Van Brister, Debtor.

In re William Gerald Robson, Debtor.

Bankruptcy Nos. 99–24388TMT, 98–23948TMT, 98–30406SR, 98–30944DWS.

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

Nov. 18, 1999.

Charles E. Petrie, Harrisburg, PA, for respondent.

Robert H. Holber, Media, PA, trustee in Wagner case.

John D. McLaughlin, Jr., Office of the United States Trustee, Philadelphia, PA, United States Trustee Rep.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA, United States Trustee Rep.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

We find ourselves confronted with the problem of what action to take to ensure that a bankruptcy petition preparer will comply with our previous order enjoining him from engaging in the unauthorized

practice of law in light of our finding that he has violated that order in the case before us, has almost certainly done so in other cases, and will be very likely to continue to do so unless we take corrective action. We conclude that the only effective remedies are a broad nationwide injunction, as authorized by 11 U.S.C. § 110(j)(2)(B), and a directive that all of the petition preparer's Pennsylvania customers, since the entry of our original injunction, be identified and have their payments refunded by him.

## B. PROCEDURAL AND FACTUAL HISTORY

As described in writings reported as *Patton v. Scholl*, 1998 WL 779238 (E.D.Pa. Nov. 6, 1998) ("*Patton I*"), aff'd as modified, 1999 WL 431095 (E.D.Pa. June 28, 1999) ("*Patton II*"), the activities of William J. Patton ("Patton") have been subject to this court's attention since August 31, 1998.[1] After a hearing at which three of his customers and Patton testified, we entered an order of September 23, 1998 ("the 9/23 Order"), providing that

2. Patton and any person acting as employees or in concert with them, is/are permanently ENJOINED from

(a) assisting any parties in filing bankruptcy cases; and

(b) accepting fees for representing parties in filing bankruptcy cases or for referring parties to attorneys to file bankruptcy cases, either directly or indirectly, in this jurisdiction or in any other jurisdiction of the United States.

The 9/23 Order was based on, *inter alia*, the following findings, catalogued in *Patton I*, at *5, regarding Patton's activities:

After taking down all of their debts and their income, he proceeded to complete the papers necessary to file their respective Chapter 7 cases.... He selected the exemptions to be taken by the Debt-ors. He determined how their debts were to be categorized. He also made other important legal decisions for them, as noted hereinafter....

We made these comments, *id.* at *5, *6, regarding Patton's performances of these services:

With respect to the exemptions claimed in each case, rather than choosing between the federal and state exceptions, see 11 U.S.C. § 522(b), as the Schedule "C" form itself instructs ("check one box"), both state and federal exemptions are claimed (both boxes are checked) for each Debtor. No reference is made to any particular provision of state law or federal law, *e.g.*, the applicable subsections of 11 U.S.C. § 522(d), as is required to make proper claims of exemptions ...

Patton also determined how the Debtors' debts were to be categorized, *i.e.*, whether they were to appear on Schedule "D" (secured debts), Schedule "E" (unsecured priority debts), or Schedule "F" (general unsecured debts). On Robson's Schedule "E" appear City real estate taxes and water and sewer delinquencies, and real estate taxes and similar municipal debts on Brister's Schedule "E." However, these debts are almost certainly properly classified as secured debts, which should appear on Schedule "D." ...

... Schedule "B" requests a listing of the debtor's executory contracts. The home mortgages of Robson and Brister and Brister's secured auto lien are so listed. Such contracts are, however, secured debts, not executory contracts. An appropriate example of an executory contract is Yeakley's residential lease, which is not listed on his Schedule "G."

The secured home mortgages debts of Robson and Brister and Brister's auto loan are also listed on their respective

---

1. Patton has appealed *Patton II* to the Third Circuit Court of Appeals, where it is docketed at No. 99–1564 *sub nom. In re Yeakley.* On July 29, 1999, the district court denied a motion to stay its order pending this appeal.

"Statements of Intention" forms as debts which will be reaffirmed ...

We concluded that these practices of Patton constituted unauthorized practice of law under 42 Pa.C.S. § 2524(a). *Id.* at *9–*13. We also noted that

> Patton's use of the title "Esquire," which in our experience is used exclusively by attorneys, in itself appears to constitute a violation of this statute. *Id.* at *10.

The scope and form of the 9/23 Order was described in *Patton I, id.* at *13–*14, as almost identical to these approved by the district court in *In re Bodnar,* 1998 WL 480856, at *2 (E.D.Pa. Aug. 13, 1998); *In re White,* 1995 WL 612931, at *2, *5 (E.D.Pa. Oct. 11, 1995); *In re Skobinsky,* 167 B.R. 45, 47, 53 (E.D.Pa.1994); and *In re Gavin,* 181 B.R. 814, 826 (Bankr. E.D.Pa.), *modified and expanded,* 184 B.R. 670 (E.D.Pa.1995). *Patton I,* at *13–*14.

On December 18, 1998, the district court stayed the 9/23 Order pending Patton's appeal therefrom ("the 12/18 Order"). *Patton II,* at *4. Nevertheless, in the ultimate *Patton II* decision, the district court affirmed our legal conclusion that Patton had engaged in the unauthorized practice of law. *Id.* at *5–*9. However, the district court further held that the 9/23 Order was too broad. Specifically, it was found that the injunction should be limited geographically to Pennsylvania and that it should not extend to activities which did not constitute the unauthorized practice of law, such as selling bankruptcy forms and providing typing services. *Id.* at *10, *11. The court did state, however, at *11, that

> [t]here is nothing in the record before the court to indicate that Patton would attempt to overstep the restrictions imposed in a more tailored injunction and, if he does, that issue may be examined in the bankruptcy cases of his future clients.

On this basis, the matter was hence remanded to this court, *id.* at *12,

> to issue an injunction prohibiting William J. Patton from engaging in the

unauthorized practice of law in Pennsylvania. The bankruptcy court, if it desires, may also specifically enjoin Patton from, *inter alia,* (1) advising his clients about which Chapter of bankruptcy they should elect, (2) describing the different bankruptcy chapters to his clients, (3) assisting his clients in completing bankruptcy petitions and schedules, by categorizing debts or contracts and selecting exemptions, (4) defining bankruptcy terms for his clients, and (5) correcting perceived errors or omissions on his clients' bankruptcy petitions.

After scheduling a hearing pursuant to our post-remand order of June 25, 1999, we entered an Order of July 15, 1999 ("the 7/15 Order"), providing as follows:

> 1. Patton shall refund the entire fee of $250 paid to him by each of the debtors and shall provide evidence to the court in chambers of same on or before July 30, 1999, or shall be subject to the contempt powers of this court.

> 2. Patton and any person acting as employees or in concert with them, is/are permanently ENJOINED from

> > (1) engaging in the actions of unauthorized practice of law, including, but not limited to

> > (a) advising his clients about which Chapter of bankruptcy they should elect,

> > (b) describing the different chapters to his clients,

> > (c) assisting his clients in completing bankruptcy petitions and schedules, by categorizing debts or contracts and selecting exemptions,

> > (d) defining bankruptcy terms for his clients,

> > (e) and correcting perceived errors and omissions of his clients' bankruptcy petition; and

> > (2) accepting any compensation for such conduct in bankruptcy cases, either directly or indirectly,

in this jurisdiction or in any other jurisdiction of the Commonwealth of Pennsylvania.

On October 25, 1999, we were informed by the Reading office of this court that Patton had been identified · as a petition preparer, having charged his previous fee of $250, by debtor BETTY JANE WAGNER ("the Debtor") in connection with her Chapter 7 bankruptcy case. On October 26, 1999, we entered an Order ("the 10/26 Order")[2] providing that, since these services may have been [performed] in violation of this court's Order of July 15, 1999, ... and ... appear to may have been performed in violation of 11 U.S.C. §§ 110(f)(1) (Patton continues to use the term "Esq.," which commonly designates lawyers and hence is a "legal" term, despite our disapproval of same) and (h)(2) (fees in excess of the value of same appear to have been charged, since all Patton is reputed to have done is basically to have typed up the papers. *See In re Evans,* 153 B.R. 960, 969–72 (Bankr.E.D.Pa.1993)), it is ORDERED as follows:

1. Patton is DIRECTED to file with this court and serve upon this court in chambers at the address below and the United States Trustee's office, a written response to the following inquiries, on or before November 2, 1999:

 a. What services he claims to have performed for the Debtor;

 b. What sums, if any, were charged for these services;

 c. The names and case numbers of any other bankruptcy cases filed in any jurisdiction in which he has charged fees for assisting the debtors but has not entered an appearance as counsel for the debtors since September 22, 1998.

 d. What advertisements for his services he utilizes or has utilized since September 22, 1998. Copies of any written handouts or advertisements shall be produced.

2. Patton and the Debtor are thereafter directed to participate in a hearing to show cause why Patton should not be held in contempt of this court's Order of July 15, 1999; compelled to refund any sums charged to the Debtor; permanently enjoined from assisting any parties in filing bankruptcy cases; permanently enjoined from charging any persons for assisting them in filing bankruptcy cases; permanently enjoined from any violations of 11 U.S.C. § 110; and subjected to any penalties set forth in 11 U.S.C. § 110, on

THURSDAY, NOVEMBER 4, 1999, AT 9:30 A.M. . . . .

At the request of Patton and the Debtor, the hearing scheduled in the 10/26 Order was continued to November 9, 1999. In a response to the questions posed in the 10/26 Order, dated November 2, 1999, Patton stated as follows:

1. What services he claims to have performed for the Debtor:

Answer: "I entered the information provided me by the Debtor on the computer. Generated 6 sets of Petitions and Schedules and all other related documents. I made numerous copies of the papers, printed the sets as described, stapled, and the IN HOME service trips. I fax copies of the Petition page to creditors who call here asking for it."

2. What sum, if any, were charged for these services:

Answer: "I charged $250 flat preparation fee."

---

2. We have received a copy of a document captioned *Patton v. Scholl* which seeks an "emergency immediate injunction pending appeal" of this order. The basis for this appeal, if that be what it is, is that the 10/26 Order should not have been entered by this court because this court is no longer the Chief Judge of the court and the underlying case was assigned to Judge Twardowski of this court. However, all petition preparer matters in this district have been delegated to this court by present Chief Judge Fox. Furthermore, this matter concerns enforcement of this court's own 7/15 Order.

3. The names and case numbers of any other bankruptcy cases filed in any jurisdiction in which he has charged fees for assisting the debtors but has not entered an appearance as counsel for the debtors since September 22, 1998. Answer: "I do NOT charge fees for assisting any debtors and never enter an appearance as counsel, as I am NOT an attorney, but a Non–Attorney Bankruptcy Preparer as defined by 11 U.S.C. § 110, and affirmed by U.S. District Court Judge Yohn."

When advised by our Courtroom Deputy that question 3 requested the identify of *all* persons charged the $250 fee for whatever services he claimed were performed by him, Patton persisted in his refusal to do so in a "Second Response" dated November 8, 1999, stating that

[m]y response is "I NEVER charge fees for assisting debtors. I prepare their petitions and schedules as instructed by the debtor. I NEVER enter an appearance as counsel for the debtor, as I am not a counsel, but a Non–Attorney Bankruptcy Preparer, as defined in 11 U.S.C. § 110, and affirmed by Judge Yohn of the U.S. District Court last year."

At the hearing of November 9, 1999, Patton admitted that he had filed "thirty, thirty-five, maybe" petitions for debtors in the Middle District of Pennsylvania since September 22, 1998. One of these filings, for Debtor Gregory Kiner on July 13, 1999, was in fact a matter properly venued in this district and was accordingly transferred here on November 8, 1999, too late to include in the November 9, 1999, hearing. Although Patton promised to fax our Courtroom Deputy a list identifying "every one" of the cases in which he collected fees in any capacity, as we clearly requested in the 10/26 Order by November 2, 1999, no further response has been received to date.

The only witnesses at the November 9, 1999, hearing were the Debtor and Patton. We must unfortunately conclude that, despite her denials, we found the Debtor to have been extensively "coached" by Patton to provide answers which were exculpatory to him, and therefore she was not entirely credible in relating her experiences with him.

The Debtor, a divorcee residing in Leesport, PA., related that she had initially consulted a law firm about filing bankruptcy. While she paid a $200 retainer and claimed to have made her choice to file under Chapter 7 as a result of her consultation with a lawyer there, the Debtor did not retain the law firm because she was unable to afford the $800 balance of the total fee demanded. One Rob Conway, an acquaintance of her boyfriend, then referred her to Patton, whose business was located about fifty miles away in Harrisburg. While Patton reportedly originally refused to handle her case because it would have to be filed in this district where he had experienced certain unexplained "trouble," the Debtor stated that, when she informed him that she was "desperate," he relented. We note that the Debtor recited no facts indicating why an imminent bankruptcy filing was necessary.

On some occasions volunteering these statements without questions, the Debtor repeated, like a mantra, throughout the hearing, "he did the paperwork, but that's all" and "[h]e didn't give me any information." However, logic dictates otherwise. The Debtor further testified that all that she gave to Patton to prepare her Schedules and Statement of Affairs were her bills and a statement of income. Somehow, presumably by magic, the Schedules and Statement of Affairs, listing "William J. Patton, Esq." as their preparer, were produced.

In listing her property, which includes a mobile home which she owns that is situated on real estate which she also owns, the mobile home only was listed on "Schedule A—Real Property." The Debtor claimed to have made this possibly erroneous decision herself, although her vague under-

standing of the distinction between real and personal property renders her participation in this choice doubtful.

The discussion regarding "Schedule C—Property Claimed as Exempt" was the most revealing, because the Debtor apparently forgot her "script" during this exchange. The Debtor eventually admitted that she had no concept of what "exemptions" were or what role they played in her case. Neither of the boxes for choosing federal or state exemptions were checked. We note that this is a similar response to that filled in by Patton on Schedule C for his prior clients in *Patton I,* where both boxes were checked. However, in addition to describing the property, as, for example, her mobile home, the Debtor's Schedule A specified "522(d)(1)" as the law providing for the exemption. The Debtor admitted that she had "no idea" what "522(d)(1)" meant. While she initially nevertheless denied that Patton had decided to put this citation there, she ultimately reluctantly admitted that Patton had chosen all of the exemption selections on that Schedule.

The Debtor apparently remembered her script better when providing an explanation as to why debts were included on "Schedule D—Creditors Holding Secured Claims"; "Schedule E—Creditors Holding Unsecured Priority Claims," or "Schedule F—Creditors Holding Unsecured Nonpriority Claims." However, the illogic of her explanation as to how these Schedules could have been completed entirely as a result of her own choices was equally revealing. The Debtor admitted that she did not know what "secured" or "priority" claims were, but nevertheless insisted that she and not Patton chose on which Schedule they would be placed. From this testimony, we conclude, with little doubt, that Patton chose the Schedules on which each of her debts were listed. This conclusion is bolstered by our observation that unpaid school tax and real estate taxes were included on Schedule E and not, as would appear correct, on Schedule D. This mistaken listing of secured tax debts was

among the errors of Patton on the forms of his other customers referenced in *Patton I.* See pages 114–115 *supra,* quoting *Patton I,* at *5.

We also note that "Schedule G—Executory contracts and Unexpired Leases" and the Individual Debtor's "Statement of Intentions" were also filled out on the exact same erroneous manner as the forms of the debtors at issue in *Patton I.* See pages 114–115, quoting *Patton I,* at *5–*6. The Debtor's obligations on her secured auto loan and mobile home "mortgage" are listed on both Schedule G and the Statement of Intentions forms. The choice of the Debtor to "REAFF" was made in the exact same abbreviation as were the *Patton I* debtors' similar choices. The Debtor's lack of any knowledge of the concept of the reaffirmation process renders it almost certain that Patton decided how the Statement of Intention form would be completed. *See id.*

Patton then took the stand. He claimed, directly contrary to the Debtor, that she had filled out a blank form of the Schedules which he merely typed. Although the Transcript reveals to the contrary, Patton insisted that the Debtor had so testified. It appears to us that Patton confused the scripted testimony which he attempted to coach the Debtor to provide with her actual testimony.

When Patton stated that the Debtor had thus selected all of the entries on the Schedules, and had so testified, we again pointed out that this testimony, in another conflict between the Debtor's script and her actual statement, was not only inconsistent with the Debtor's testimony of her own complete lack of knowledge of the substance of what was asked, but also was not what had been testified to by her. With respect to the selection of exemptions, which the Debtor had reluctantly finally admitted that Patton had done, Patton claimed that the Debtor had selected the exemptions as they appeared on his computer and that she had so testified.

Again, the transcript and Patton's memory were at odds.

We asked Patton why, if all he had was simply type her responses on to the Schedules, he had not referenced her, in her "desperation," to a stationary store where the forms could be purchased for under $5.00 and filled out by hand, rather than have the Debtor make a round trip of about 100 miles one way from Leesport to Harrisburg and back. Patton replied, with unusual candor, "I'm in business to make money.... I pay for the forms, I paid for the software, the printer, the computers."

Patton presented no analysis for what specific services, extending for any particular time frames, the $250 charge was allocated. In response to questioning by Assistant United States Trustee Frederick J. Baker, Esquire, Patton appeared to claim that his computers automatically made many of the selections for him and the Debtor in filling out the Schedules.

At the close of the hearing, Baker argued that, even if Patton's testimony were accepted as credible, he had been proven to have acted in violation of the 7/15 Order in providing services to the Debtor. Baker further commented that the Debtor's testimony was indeed inconsistent with that of Patton in numerous significant particulars. He argued that neither were credible in attempting to minimize the dominant role that Patton played in the process of preparation on all of the Debtor's documents.

## C. DISCUSSION

■ At the close of the hearing, we came to one rather obvious conclusion. After the entry of the 12/18 Order,[3] Patton resumed precisely the same business practices in which he had engaged previously, despite the decisions in *Patton I* and *Patton II* and the entry of the 7/15 Order. This truth is exemplified by our noting that not only the main features of this practice, *e.g.*, completing the Schedules for a flat $250 fee, were retained, but also many of the idiosyncratic aspects of Patton's practice were continued, such as designating himself as "Esquire," refusing to make the necessary federal/state exemption choice, listing secured tax debts as priority debts, and designating secured debts as executory contracts. The reappearances of such distinct form-completion idiosyncrasies are proof positive that Patton placed a very significant role in the completion of the Debtor's Schedules. As for their disclaimers of his pervasive role, we find that both he and the Debtor "protesteth too much." As a result, we refuse to find them credible on that point.

■ Therefore, we conclude, with no hesitancy, that Patton has continued, at all pertinent times, to engage in the same sort of unauthorized practice of law as he always did. As for the contention that "the computer did it," we well merely reiterate what we said in *Patton I*, at *13:

> To the extent that Patton attempted to attribute his choice of exemptions for the Debtors to a computer program rather than himself, this contention is answered by the following passage in [*In re*] *Kaitangian*, *supra*, 218 B.R. [102,] at 110: [(Bankr.S.D.Cal.1998)]:
>
>> "The Court finds that [the Respondents'] contention that the Bankruptcy Speciality Software 'does it all' is disingenuous. Plugging in solicited information from questionnaires and personal interviews to a prepackaged bankruptcy software program constitutes the unauthorized practice of law. Moreover, advising of available exemptions from which to choose, or actually choosing an exemption for the debtor with no explanation, requires the exercise of legal judgment beyond the capacity and knowledge of lay persons. *In re Herren*, 138 B.R. 989, 995

---

**3.** If Patton was relying on the 12/18 Order staying the 9/23 Order pending his appeal as a basis for defiance of the 9/23 Order, Patton was clearly acting at his risk that the 9/23 Order would not be affirmed. It was of course ultimately affirmed as modified. The affirmance rendered his conduct which constituted unauthorized practice of law illegal.

(Bankr.D.Wyo.1992); *In re McCarthy,* 149 B.R. 162, 166 (Bankr.S.D.Cal. 1992); *In re Webster,* 120 B.R. 111, 113 (Bankr.E.D.Wis.1990). Accordingly, the Court finds that the [Respondents] engaged in the unauthorized practice of law with respect to selecting exemptions for the debtors in these proceedings."

*See also [In re] Samuels, supra,* 176 B.R. [616,] at 624–25 [(Bankr.M.D.Fla. 1994)].

We further conclude that Patton's activities violated 11 U.S.C. § 110 in two respects, both of which were referenced in the 10/26 Order and hence of which Patton was put on notice we would consider at the November 9, 1999, hearing. The sections of § 110 which we deem significant in our discussion are §§ 110(f)(1), (f)(2), (h)(2), (h)(4), (i)(1), (j)(1), and (j)(2), which provide as follows:

(f)(1) A bankruptcy petition preparer shall not use the word "legal" or any similar term in any advertisements, or advertise under any category that includes the word "legal" or any similar term.

(2) A bankruptcy petition preparer shall be fined not more than $500 for each violation of paragraph (1) . . . .

(h)(2) The court shall disallow and order the immediate turnover to the bankruptcy trustee of any fee . . . found to be in excess of the value of services rendered for the documents prepared. An individual debtor may exempt any funds so recovered under section 522(b) . . . .

(4) A bankruptcy petition preparer shall be fined not more than $500 for each failure to comply with a court order to turn over funds within 30 days of service of such order.

(i)(1) If . . . a bankruptcy petition preparer violates this section or commits any fraudulent, unfair, or deceptive act, the bankruptcy court shall certify that fact to the district court, and the district court, on motion of the debtor, the trustee, or a creditor and after a hearing,

shall order the bankruptcy petition preparer to pay to the debtor—

(A) the debtor's actual damages;

(B) the greater of—

(i) $2,000; or

(ii) twice the amount paid by the Debtor to the bankruptcy petition preparer for the preparer's services; and

(C) reasonable attorneys' fees and costs in moving for damages under this subsection . . . .

(j)(1) A debtor for whom a bankruptcy petition preparer has prepared a document for filing, the trustee, a creditor, or the United States trustee in the district in which the bankruptcy petition preparer resides, has conducted business, or the United States trustee in any other district in which the debtor resides may bring a civil action to enjoin a bankruptcy petition preparer from engaging in any conduct in violation of this section or from further acting as a bankruptcy petition preparer.

(2)(A) In an action under paragraph (1), if the court finds that—

(i) a bankruptcy petition preparer has—

(I) engaged in conduct in I violation of this section or of any provision of this title a violation of which subjects a person to criminal penalty;

(II) misrepresented the preparer's experience or education as a bankruptcy petition preparer; or

(III) engaged in any other fraudulent, unfair, or deceptive conduct; and

(ii) injunctive relief is appropriate to prevent the recurrence of such conduct,

the court may enjoin the bankruptcy petition preparer from engaging in such conduct.

(B) If the court finds that a bankruptcy petition preparer has continually engaged in conduct described in subclause (I), (II), or (III) of clause (i)

and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of this title, or has not paid a penalty imposed under this section, the court may enjoin the person from acting as a bankruptcy petition preparer ....

■ First, we believe that Patton's persistence in utilizing the title "Esquire" on court papers is an "advertisement" which uses a term which is "legal" in nature, which violates § 110(f)(1). BLACK'S LAW DICTIONARY 546 (6th ed.1990), states that "Esquire," "[i]n [the] United States, [is a] title commonly appended after [the] name of [an] attorney, *e.g.*, John J. Jones, Esquire."

Whatever innocence regarding this usage Patton may have once had in utilizing this designation, our *Patton I*, decision put him on notice that we considered this usage an attempt to hold himself out as, if not an attorney, a person with abilities in legal matters. *See Patton I*, at *10, quoted at pages 114–115 *supra*. Indeed, we can conceive of no other reason for Patton's use of the term "Esquire," despite written disclaimers distributed to his customers which we find which merely draw their further attention to his use of this title, other then to falsely elevate his perceived stature as an experienced and competent in legal matters such as bankruptcy. We would enjoin Patton's use of "Esquire" in the future except that, since we are enjoining all of his petition preparer activities, *see* page 123 *infra*, the point of his using the "Esquire" designation in the future in such activities becomes moot. However, we will not impose any fine, pursuant to § 110(f)(2), or make a referral under 11 U.S.C. § 110(i) as to this § 110 violation, because we admittedly did not reference this violation in the 9/23 Order. We should add that we do find that Patton's persistence in its usage, despite our *Patton I* comments, is symptomatic of Patton's refusal to respect this court's pronouncements.

■ We also find a violation of § 110(h)(2) in Patton's imposing a $250 charge upon the Debtor. As *Patton II*, at *12, makes clear, a bankruptcy petition preparer who engages in the unauthorized practice of law is not entitled to retain *any* fees for services. Therefore, any fee charged is in excess of the value of the services thereby illegally performed.

In our 10/26 Order we also cited Patton to our pre– § 110 decision in *In re Evans*, 153 B.R. 960 (Bankr.E.D.Pa.1993). One of the petition preparers whose practices were at issue in that decision asserted, as did Patton at the November 9, 1999, hearing, that he did not engage in the unauthorized practices of law. Rather, the *Evans* petition preparer claimed that he merely let his customers use a book which explained the pertinent law and simply typed in the Schedules as filled out on forms by the customers after they had consulted this book. *Id.* at 963–64.

We were skeptical of the *Evans* preparer's testimony, believing that his actual method of providing services was not nearly so passive as he claimed. *Id.* at 969. However, despite that preparer's detailed documentation of considerable time expended on his typical cases, *id.* at 964, we measured the value of his services at much less than the $250 figure he charged. This was because we found that merely allowing his customers to use a book and providing typing services, the latter of which provided a "frill" not necessary in completing bankruptcy documents, was worth not more than $100, and required him to refund the differences in any charges over $100 to all of his clients. *Id.* at 970–72.

Patton's claims to justify a $250 fee are weaker than these of the petition preparer referenced above in *Evans* to the same fee. Patton did not provide the Debtor with access to any instructional book. The absence of any possible source on which the Debtor, who was completely unschooled regarding bankruptcy law, could have gleaned the knowledge to complete the

Schedules and other documents without any assistance from a petition preparer, also renders Patton's credibility that he claims not do so far weaker than even that of the *Evans* petition preparer. *See also In re Campanella,* 207 B.R. 435 (Bankr. E.D.Pa.1997) (selling bankruptcy "kits," even without interviewing the customers, in itself constitutes the unauthorized practice of bankruptcy law). Nor did Patton make any effort to itemize, as did the *Evans* petition preparer, the services which he allegedly performed for the Debtor and the times expended on each.

■ Rather, Patton has continued to utilize the same $250 figure which he charged when it was held that he illegally practiced law in *Patton I* and *Patton II,* even though he wants us to believe that, although charging the same amount, he has considerably reduced the scope of his services. The fair value of Patton's services as a mere typist and copier, especially in light of the fact that we are informed that blank Schedules can be obtained in carbon sets for less than $5.00 and need not be typed, is no more than $50.00. *See In re Bradshaw,* 233 B.R. 315, 327 (Bankr. D.N.J.1999) ("Courts, including this Court, have determined that $50 is generally the reasonable charge for a bankruptcy petition preparer's services.").

■ We therefore conclude that Patton clearly violated § 110(h)(2) by charging the Debtor $250 for his services, the value of which, assuming *arguendo* that he had not illegally engaged in the unauthorized practice of law, would have been not more than $50. In light of the severity of this violation, there is therefore no reason not to impose the $500 fine set forth in § 110(h)(4) upon Patton, payable to the Clerk of this Court. Finally, we will also certify this issue to the district court, for the imposition of the designated $2000 penalty in favor of the Debtor, pursuant to § 110(i)(1)(B)(i).

The foregoing penalties are rather severe, but in our view they are statutory and would be normally applied to even first offenders. They therefore fall short of addressing the issue of Patton's persistence in his illegal behavior despite our repeated warnings and consistent decisions from this court and the district court that his practices are illegal.

After the hearing of November 9, 1999, we are painfully aware of Patton's proclivity to continue his "business as usual" despite court orders prohibiting same. We are also aware that Patton will go to consistent lengths to conceal the truth of his practices. We find that the Debtor was thoroughly, though not completely successfully, coached by Patton to provide testimony exculpatory to him at the hearing of November 9, 1999. This exhibition reveals Patton's tendency to attempt to impede this court from obtaining a true picture of his activities. In sum, after that hearing, we have direct evidence of Patton's "attempts to overstep the restrictions imposed" in the 7/15 Order. As the district court suggested in *Patton II,* at *11, quoted at page 115 *supra,* we are now obliged to reexamine the issue of the effectiveness of the 7/15 Order.

In devising an appropriate remedy in these circumstances, we are instructed by a decision of Chief Judge Markovitz in our sister district in *In re Stone,* 166 B.R. 269 (Bankr.W.D.Pa.1994). The court there had before it a petition preparer who had associated himself with an attorney to attempt to circumvent an order, previously entered in *In re Harris,* 152 B.R. 440, 447 (Bankr.W.D.Pa.1993), enjoining that petition preparer, in the fashion of our 9/23 Order, from preparing any more bankruptcy petitions for filing in that court. Despite the fact that his association with an attorney did represent a significant charge in his prior practice, the court found that the petition preparer at issue had nevertheless violated the terms of the *Harris* order. As a result, the petition preparer was directed to refund all fees which he had ever collected from any of his approximately 100 customers on whose behalf he

had assisted in filing bankruptcy petitions, 166 B.R. at 276. This included his customers serviced prior to the original order entered in *Harris*. *Id.*

We also note the presence of § 110(j)(2)(B), which provides that, if a bankruptcy petition preparer continually violates § 110(j)(2)(A), and a narrower injunction is not sufficient to prevent enforcement of § 110 as to that petition preparer, the court may enjoin that preparer from continuing to act as a bankruptcy petition preparer altogether.

 Patton has engaged in unauthorized practice of law in violation of Pennsylvania criminal law, 42 Pa.C.S. § 2524(a). *See* § 110(j)(2)(A)(i)(I). He has misrepresented his experience and education by not only affixing "Esquire" to his name, but also in holding himself out as someone able to provide competent assistance to debtors in bankruptcy cases. *See* § 110(j)(2)(A)(i)(II). He engaged in fraudulent, unfair, and deceptive conduct in refusing to respond to our 10/26 Order requiring him to supply the names of all of his customers since September 22, 1998; in attempting to misrepresent his role in the preparation of the Debtor's bankruptcy case; and in coaching the Debtor provide testimony which would support his efforts. *See* § 110(j)(1)(A)(i)(III). He therefore engaged in all three types of activity referenced under § 110(j)(2)(A)(i), any one of which would justify an injunction under § 110(j)(1)(B). The 9/23 and 7/15 Orders have been proven insufficient to halt his illegal conduct. *See* § 110(j)(2)(B). An order enjoining him from ever acting as a bankruptcy petition preparer again, in any jurisdiction, is therefore totally appropriate. We note that § 110(j)(2)(B), which we did not invoke in entering the 9/23 Order, appears to support the principle that an order pursuant thereto should be national in scope. *See Bradshaw, supra,* 233 B.R. at 329; and *In re Gabrielson,* 217 B.R. 819, 828 (Bankr.D.Ariz.1998).

Our following order will also direct Patton to return the $250 paid to him by the Debtor. *See Patton II,* at *12. We note that Patton has certified that he refunded the $250 payments to debtors Yeakley and Robson, albeit not until after the 7/15 Order was entered. He has allegedly made unsuccessful efforts to refund the $250 paid to him by Brister. In fact, the Brister case has been relisted numerous times and our Courtroom Deputy has contacted Patton several times on the subject of the refund to Brister, which kept Patton consistently aware of our interest in his conduct, adding further to the flagrancy of his actions. Our order will contain a directive that Patton remit the $250 refund to Brister by mail at his last known address.

Since this order also declares that Patton has not only continued to engage in the unauthorized practice of law, but also has acted in violation of §§ 110(f)(1) and (h)(2). A fine of $500 and a certification to the district court for the entry of an award of an additional $2000 to the Debtor in light of Patton's violation of § 110(h)(2) is included in our order.

 Perhaps most importantly, a nationwide injunction prohibiting all of Patton's petition preparer activities from this time forward will be entered pursuant to § 110(J)(2)(B). Finally, taking a cue from the *Stone* order but providing a less oppressive remedy, we will order that Patton provide us with a list of all of his Pennsylvania customers from September 24, 1998, to date and direct that full refunds be paid to every one of those parties. We are restricting this remedy, at least at this juncture, to his Pennsylvania customers because we did not invoke § 110, which authorizes the nationwide scope of this order, in our 9/23 Order.

*D. CONCLUSION*

An order as described follows.