**In re Jason BOYCE, Debtor.**

No. 04–24409.

United States Bankruptcy Court, D. Utah.

Nov. 18, 2004.

Jason Boyce, West Jordan, UT, pro se.

## MEMORANDUM OPINION

### GLEN E. CLARK, Chief Judge.

On October 4, 2004, the U.S. Trustee's Motion for Fines or Disgorgement of Fees Against Petition Preparer came before the court. Laurie Cayton ("Cayton") appeared in behalf of the U.S. Trustee and Howard Johnson appeared in behalf of Aaron Meier and Aaronson Grand & Associates L.C. (collectively referred to as "Aaronson Grand"). The Court, having taken evidence and after considering the pleadings and argument of counsel issues the following memorandum opinion and order.

## JURISDICTION

Jurisdiction over bankruptcy matters is exclusive to Federal District Courts. 28 U.S.C. § 1334. 28 U.S.C. § 157 provides for the referral of bankruptcy matters to bankruptcy judges who may hear core and noncore matters pertaining to bankruptcy proceedings. This controversy concerns the preparation of a bankruptcy petition, the payment of fees to a bankruptcy petition preparer and the interpretation of bankruptcy § 110, and is a "core" matter within the meaning of § 157(b)(2)(A).

## FINDINGS

Aaronson Grand, is a dba of United Document Corporation, a document preparation, and printing service which prepares, and prints documents for customers including bankruptcy, do-it-yourself divorce, evictions, mechanics liens, and various other matters. In the past one and one-half years, Aaronson Grand has prepared bankruptcy petitions for approximately eleven hundred clients in the state of Utah. A fee of one hundred and ninety-five dollars is charged by Aaronson Grand to prepare a typical bankruptcy petition. The average amount of time devoted by Aaronson Grand for the preparation of a bankruptcy petition is four to six hours. The average number of creditors listed in a bankruptcy petition prepared by Aaronson Grand is fifty. Aaronson Grand prepares only Chapter 7 petitions. If an individual indicates a desire to file bankruptcy in any other chapter, Aaronson Grand refers the individual to various attorneys for assistance. Aaronson Grand reports that most of its bankruptcy clients seek its assistance because they cannot afford the services of an attorney to assist them in the preparation of a Chapter 7 petition. Aaronson Grand is a bankruptcy petition preparer within the meaning of 18 U.S.C. § 110(a)(1).

Aaron Meier ("Meier") is the chief executive officer, a director, and one of the shareholders of United Document Corporation, which purchased the assets and good will of Aaronson Grand in December of 2003. Shortly after the acquisition of Aaronson Grand, Meier sought the advice of Robert Eder Jr. ("Eder"), a bankruptcy attorney, who is licensed to practice law in the State of Utah, and is on active status, to review all of Aaronson Grand's forms, practices and procedures to ensure that Aaronson Grand was in compliance with applicable rules and regulations.[1] Al-

---

1. Orrin G. Hatch, Utah's senior member of the United States Senate and chairman of the Senate Judiciary Committee authored an article concerning efforts to have Brigham Young University General Counsel Thomas Griffith appointed to the D.C. Circuit Court of Appeals. Thomas Griffith, an attorney, is not licensed to practice law in the state of Utah. The article, *Putting the "controversy" over Griffith's nomination in perspective,* Salt Lake Tribune, Nov. 14, 2004 at AA3, sheds some light on the issue before the court. In part the article states:

though no guidelines for bankruptcy petition preparers have been issued by the U.S. Trustee in the District of Utah, Meier discovered that the U.S. Trustee for the Central District of California has issued guidelines with respect to bankruptcy petition preparers. The guidelines for the Central District of California set a maximum bankruptcy petition preparation service fee of two hundred dollars.

In December 2003, Meier sought out and obtained an appointment with Cayton at the Office of the U.S. Trustee for the District of Utah. Meier's purpose was to review Aaronson Grand's procedures with the U.S. Trustee in order to assure that Aaronson Grand was in compliance with requirements established by the U.S. Trustee for the District of Utah. Meier and Eder met for one hour with Cayton in December of 2003. At the meeting, Aaronson Grand's forms, procedures, and bankruptcy petition preparation fee were discussed. According to Meier and Eder, another purpose of the meeting was to establish a working dialogue with the U.S. Trustee so that if a problem or concern arose in the future, it could be dealt with through another meeting or a telephone call. As a follow-up to this meeting, Eder contacted Cayton in May of 2004 to inquire whether Aaronson Grand was required to disclose miscellaneous fees that were purportedly not related to the bankruptcy petition preparation, such as a fee charged for obtaining a credit report for a debtor or for producing copies of documents. In early June 2004, Cayton responded to Eder's May 2004, inquiry indicating that such fees should be disclosed. In response, Aaronson Grand modified its procedures to disclose additional fees charged for credit reports and document copies etc.

In March 2004, the Debtor, Jason Boyce ("Boyce"), sought Aaronson Grand's assistance with the preparation of his bankruptcy petition. During the petition preparation process, Aaronson Grand asked Boyce whether he intended to file a Chapter 7 or Chapter 13 petition. Aaronson Grand provided Boyce with information about where he should list his student loan creditors and suggested to Boyce that he obtain a credit report in order to gather additional information about his creditors. Aaronson Grand's services include a computerized software package known as EZ Filing which Aaronson Grand utilizes for the preparation of its client's bankruptcy schedules and statements. One function performed by the EZ Filing software is the preparation of "Schedule C—Property Claimed as Exempt". The EZ Filing software is programmed to prepare a Schedule C by associating the debtor's assets

Practicing law in any state requires a law license. As opposed to those in the more easily recognized "practicing attorney" role, however, those in a "general counsel" role may or may not do legal work that can be labeled the "practice of law."

In May 2003, the general counsel of the Utah State Bar advised Griffith that, if he must engage in legal practice activities, he should "closely associate with someone who is actually licensed here and on active status." In a June 2004 letter to me, five former Utah State Bar presidents echoed this description of state bar policy. A month later, the executive director of the Utah State Bar did the same.

In fact, he wrote that an unlicensed general counsel who engages in legal practice activities "should directly associate with lawyers who are licensed in the state and on active status." "Our policy has also consistently been that those who follow that advice are not engaged in the unauthorized practice of law."

The court is familiar with the concept that a paralegal may perform legal functions under the supervision of a licensed attorney without engaging in the unauthorized practice of law. From this article it appears that closely associating or directly associating with an attorney may be sufficient to avoid the problem in the State of Utah.

with exemption statutes without input or the need for decision making on the part of the debtor or the petition preparer. The EZ Filing software prepared a Schedule "C" for Boyce listing a bed, a dresser, CD's, clothing, and a 1995 Eagle Talon as exempt and listed the proper statute under Utah law for each of the claimed exemptions.[2]

Aaronson Grand utilized a courier service to file Boyce's bankruptcy petition with the United States Bankruptcy Court and charged Boyce twenty dollars for the courier service. Aaronson Grand collected the bankruptcy filing fee from Boyce to be paid to the United States Bankruptcy Court at the time of filing. The filing fee was collected in the form of a money order made payable to the United States Bankruptcy Court and was delivered to the United States Bankruptcy Court by the courier at the time that Boyce's bankruptcy petition was filed on March 19, 2004. Aaronson Grand charged Boyce a fee for photocopying services. The only fee disclosed as a payment related to debt counseling or bankruptcy in response to question # 9 of Boyce's Statement of Financial Affairs was the one hundred and ninety-five dollar bankruptcy petition preparation fee charged by Aaronson Grand.

On June 8, 2004, the U.S. Trustee filed its motion for sanctions against Aaronson Grand. At the hearing of October 4, 2004, Meier testified that because debtor's statement of financial affairs asks for disclosure of fees related to the document preparation, he listed the one hundred and ninety-five dollar document preparation fee. He testified that as soon as he learned of Cayton's view that all fees should be disclosed, he immediately caused the procedures at Aaronson Grand to be modified to disclose receipt of all fees. The modification of Aaronson Grand's procedure to disclose all fees was made prior to the U.S. Trustee's filing of this motion for sanctions.

Meier testified that Aaronson Grand no longer collects the filing fee from debtors and instead, provides the debtors with a map and instructions on how to find the United States Bankruptcy Court so that debtors can file their own petitions and pay their own filing fee. There is no allegation that Aaronson Grand collected the filing fee in order to manipulate the petition date, create a cash float or to otherwise utilize the filing fee for any improper purpose.

Meier testified that in addition to advising their clients that the employees of Aaronson Grand are not attorneys and that they are not giving legal advice, the admonition that Aaronson Grand will not provide legal advice is found on at least three of the documents provided to Aaronson Grand clients.

The U.S. Trustee introduced evidence that the rate charged by a local professional typing service is twelve dollars per hour and that after examining Boyce's petition, schedules, and statements the typing service estimated that it would take approximately four hours to prepare the same documents. After reading the provisions of 11 U.S.C. § 110, the witness for the typing service testified that if she were presented with a request to prepare a bankruptcy petition, she "probably would decline the job maybe, I don't know". (tr. at p. 14, line 5)

## ANALYSIS

The U.S. Trustee seeks sanctions under 11 U.S.C. § 110(g)(1) arguing that Aaronson Grand collected or received payment from Boyce for the court fees in connection

---

2. Utah has opted out of the federal exemption list.

with the filing of Boyce's bankruptcy petition, that Aaronson Grand's fees are excessive and should be disallowed pursuant to 11 U.S.C. § 110(h)(2), that Aaronson Grand has violated 11 U.S.C. § 110(k) by engaging in the unauthorized practice of law, and that by failing to disclose all fees paid by Boyce, Aaronson Grand has made a false statement to the Court in its disclosure of compensation. The U.S. Trustee argues that the Court should certify this matter to the United States District Court for a determination of sanctions pursuant to 11 U.S.C. § 110(i)(1).

Aaronson Grand responds arguing that any violation of 11 U.S.C. § 110 was inadvertent, and that Aaronson Grand consistently tried to comply with the requirements of the Bankruptcy Code, and with the requirements of the U.S. Trustee. Aaronson Grand also points out that as soon as it became aware that its procedures might be in violation of the Bankruptcy Code or in violation of any written or unwritten guidelines promulgated by the U.S. Trustee, it promptly modified its procedures to become compliant.

 Congress enacted § 110 to set standards for bankruptcy petition preparers and to penalize bankruptcy petition preparers who fail to meet those standards.[3] The statute's main purpose is to protect consumers.[4] Protecting *pro se* debtors is a laudable and worthwhile goal, however overzealous protection can lead to undesired results. In this Court's view, there is an important place in the bankruptcy system for bankruptcy petition preparers. Over the years, this Court has observed far too many handwritten *pro se* petitions that are barely legible. Compared to a handwritten petition, a computer generated petition is a breath of fresh air. Legible and neatly written schedules and statements assist the court, they assist creditors, they assist Chapter 7 trustees, they assist Chapter 13 trustees, and they probably assist the U.S. Trustee. When a debtor's bankruptcy petition is well typed, everyone benefits. This Court views 11 U.S.C. § 110 as a statute designed to punish a bankruptcy petition preparer who violates any of the enumerated prohibitions found in the statute. The Court does not view the statute as an effort to expand or to limit the range of services that a bankruptcy petition preparer may perform under state law or the rules of this court. 11 U.S.C. § 110(k) does not enlarge, nor does it diminish what is considered to be the unauthorized practice of law and this Court does not view the statute as a mandate to put bankruptcy petition preparers out of business.

 **11 U.S.C. § 110(g)(1)**—It is undisputed that Aaronson Grand accepted Boyce's filing fee in the form of a money order made payable to the Bankruptcy Court. Acknowledging that there is a split in authority with respect to whether acceptance of a check or money order made payable to the bankruptcy court constitutes a violation of § 110(g)(1) of the Code, this court joins the majority and finds that such conduct is prohibited by § 110(g)(1). The fact that Aaronson Grand discontinued this practice upon learning that it may be prohibited argues in favor of a reduced sanction.

 **11 U.S.C. § 110(h)(2)**—Aaronson Grand, in its disclosure of compensation of bankruptcy petition preparer, states that it prepared the following for the debtor: Voluntary Petition, Verification of Creditor Matrix, Statement of Financial Affair, Summary of Schedules, Schedule A—Real

---

**3.** *See In re Farness,* 244 B.R. 464 (Bankr.D.Idaho 2000).

**4.** *In re Fraga,* 210 B.R. 812, 818–19 (9th Cir. BAP 1997).

Property, Schedule B—Personal Property, Schedule C—Property Claimed as Exempt, Schedule D—Creditors Holding Secured Claims, Schedule E—Creditors Holding Unsecured Priority Claims, Schedule F—Creditors Holding Unsecured NonPriority Claims, Schedule G—Executory Contracts and Unexpired Leases, Schedule H—Co-debtors, Schedule I—Current Income of Individual Debtor(s), Schedule J—Current Expenditures of Individual Debtor(s), Declaration Concerning Debtor's Schedules, Notice to Individual Consumer Debtor, Chapter 7 Individual Debtor's Statement of Intention, and the Disclosure of Compensation of Bankruptcy Petition Preparer. For this preparation work, Aaronson Grand was paid one hundred and ninety-five dollars. The U.S. Trustee argues that Aaronson Grand's fee is excessive because a typing service estimated the job of typing Boyce's bankruptcy petition as a four hour task for which the typing service would charge twelve dollars per hour for a total fee of forty-eight dollars. However, after reading § 110, the witness for the typing service indicated that she would probably decline the bankruptcy petition preparation work. Given the risks and responsibilities posed by § 110, it does not make sense for a typing service to charge the same rate for bankruptcy petition preparation work as it would for ordinary typing. The court finds that bankruptcy petition preparation is not analogous to ordinary typing. When determining the appropriate compensation rate for an applicant's billable hours, the court should base the hourly rate on what the market commands for analogous work.[5] A bankruptcy petition preparer fee is more akin to the fee charged by a bankruptcy paralegal.[6] Given the heightened risks and responsibilities, one hundred and ninety-five dollars is a reasonable fee for the accurate and well organized preparation of a bankruptcy petition.

■ **Unauthorized Practice of Law—** Aaronson Grand responded to basic questions asked by the Debtor concerning the preparation of the Debtor's bankruptcy schedules and statements, and used a computer utilizing specialized software known as EZ Filing to create the bankruptcy schedules and statements, including Schedule "C" the debtor's scheduled exemptions. The EZ Filing software matches a debtor's assets with enumerated statutes under Utah Code Annotated without input from the debtor. The Court is aware of the numerous published opinions addressing the issue of bankruptcy petition preparers and the unauthorized practice of law. The opinions addressing this issue are uniform in their voice that bankruptcy petition preparers may not even answer basic questions about bankruptcy[7] and may not use computer software[8] to prepare schedules,

**5.** *United Phosphorus, Ltd., v. Midland Fumigant, Inc.,* 205 F.3d 1219 (10th Cir.2000).

**6.** *See In re Landry,* 268 B.R. 301 (Bankr.M.Fla.2001)(reasonable fee for a bankruptcy petition preparer is that of a paralegal in the market area).

**7.** *In re Guttierez,* 248 B.R. 287, 297–98 (Bankr.W.D.Tex.2000)(§ 110 proscribes virtually all conduct falling into the category of guidance or advice, effectively restricting petition preparers to rendering only scrivening/typing services); *In re Moffett,* 263 B.R. 805, 815 (Bankr.W.D.Ky.2001)(petition preparer may not provide any guidance as to how to fill out bankruptcy schedules).

**8.** *In re Kaitangian,* 218 B.R. 102, 110 (Bankr. S.D.Cal.1998)(use of prepackaged bankruptcy software constitutes the unauthorized practice of law); *In re Farness,* 244 B.R. at 470–72 (use of computer software to convert a client's raw information into usable form is the unauthorized practice of law); *In Reynoso,* 315 B.R. 544, 552 (9th Cir. BAP 2004)(solicitation of information which is then translated into completed bankruptcy forms is the unauthorized practice of law, whether by website or otherwise); *In re Wagner,* 241 B.R. 112, 119

statements or identify exempt assets. There are strong policy reasons to find otherwise. *Pro se* debtors, as a group, lack the financial resources to afford an attorney, and on their own, they will likely fail to correctly claim exemptions to which they are legally entitled. The rule that exemption laws are to be construed liberally in favor of exemption,[9] is helpful to a *pro se* debtor only if exemption is claimed. The cruel irony of this is that *pro se* debtors are the group of debtors who can least afford to lose anything. State law governs the unauthorized practice of law.[10] Because the law varies from state to state, what may be the unauthorized practice of law in one state, may not be the unauthorized practice of law in another. Utah Code Annotated deals with the issue of the unauthorized practice of law as follows:

## CHAPTER 9

## UNAUTHORIZED PRACTICE OF LAW

**78–9–101. Practicing law without a license prohibited—Exceptions [Repealed effective May 3, 2007].**

(1) Unless otherwise provided by law, a person may not practice law or assume to act or hold himself out to the public as a person qualified to practice law within this state if he:

(a) is not admitted and licensed to practice law within this state:

(b) has been disbarred or suspended from the practice of law; or

(c) is prohibited from doing so by court order entered pursuant to the court's inherent powers or published court rule.

(2) The prohibition against the practice of law in Subsection (1) shall be enforced by any civil action or proceedings instituted by the Board of Commissioners of the Utah State Bar.

(3) Nothing in this section shall prohibit a person from personally and fully representing his own interests in a cause to which he is a party in his own right and not as an assignee.

**78–9–102. Repealed 2004**

 Chapter 9 of Utah Code Annotated provides little guidance with respect to defining what is to be considered the "practice of law" within the state of Utah and is, at best, ambiguous. Likewise, the case law respecting the unauthorized practice of law is inconclusive with respect to the type of controversy presently before the Court[11]. If a statute is ambiguous, a court may seek guidance by reviewing the legislative history. Ambiguous text can also be decoded by knowing the purpose behind the statute.[12] A review of the history behind Chapter 9 of the Utah Code

(Bankr.E.D.Penn.1999)(plugging solicited information into a prepackaged bankruptcy software program constitutes the unauthorized practice of law).

9. *In re Lampe,* 331 F.3d 750 (10th Cir.2003).

10. *In re Stacy,* 193 B.R. 31, 38 (Bankr.D.Or. 1996); *In re Lyvers,* 179 B.R. 837, 840 (Bankr.W.D.Ky.1995).

11. *Board of Commissioners of the Utah State Bar v. Petersen,* 937 P.2d 1263 (Utah 1997)(practice of law includes not only ap-

pearing in court, but also drafting complaints, drafting or negotiating contracts, drafting wills, counseling or giving advice on legal matters, and many other things); *Utah State Bar v. Summerhayes & Hayden, Public Adjusters,* 905 P.2d 867 (Utah 1995)(practice of law, although difficult to define precisely, is generally acknowledged to involve the rendering or services that require the knowledge and application of legal principles to serve the interests of another with his consent.)

12. *In re Geneva Steel Co.,* 281 F.3d 1173 (10th Cir.2002).

sheds light on the legislative intent with respect to the unauthorized practice of law. Section 78–9–102 was enacted by the Utah State Legislature in 2003 and reads as follows:

**78–9–102. Practice of law defined— Who may practice [Effective May 3, 2004].**

(1) The term "practice of law" means appearing as an advocate in any criminal proceeding or before any court of record in this state in a representative capacity on behalf of another person.

(2) Only persons who have been admitted by the Supreme Court of this state to practice law may practice or hold themselves out as licensed to practice law in this state.

(3) A person may not use "J.D.", "Esq.", "attorney", or "attorney-at-law" on business cards, signs, advertisements, or official documents as those terms are used to indicate status as an attorney, unless licensed to practice law.

Utah Code Annotated § 78–9–102 was repealed May 3, 2004. Of interest also is Utah 2001 Session Laws, 54th Legislature, Second Special Session (2001) CH. 3 (H.B. 2003) which reads as follows:

**UNAUTHORIZED PRACTICE OF LAW AMENDMENTS**

**CH. 3**

This act creates legislative findings on the accessibility of legal services within the state of Utah and adds a new section to the Judicial Code pertaining to the unauthorized practice of law by persons not licensed in this state. This act takes effect immediately and is repealed on May 1, 2003.

This act affects sections of Utah Code Annotated 1953 as follows:

ENACTS:

63–55b–178, Utah Code Annotated 1953

78–9–101, Utah Code Annotated 1953

This act enacts uncodified material.

Be it enacted by the Legislature of the state of Utah:

CH. 3, § 1

Section 1. Legislative finding on the accessibility of legal services—Charge to Judiciary to study the issue and suggest changes.

(1) The Legislature finds that:

(a) there is significant unmet need for legal services within the state of Utah;

(b) this unmet need for legal services is linked in part to the high cost of those services within the state of Utah;

(c) the unmet need for legal services adversely impacts the health, safety, and welfare of Utah citizens;

(d) in many situations, non-attorney professionals now provide, at low costs to consumers with adequate protections, services previously reserved by law to attorneys;

(e) the right of a person to represent himself and his interests in a court of law is a recognized right in our legal system; and

(f) recent enhanced technological capabilities have helped people access information needed to handle their own legal issues.

(2) The Legislature requests that the Judiciary study the following:

(a) increasing the availability of standardized legal forms for use in filing legal matters;

(b) increasing the use of technology to make legal services available to the public; and

(c) allowing nonlawyers to provide charitable legal help;

(d) allowing duly-authorized officers to represent their business entities; (e) allowing independent lay professionals to perform certain functions now requiring an attorney.

The findings of the 54th Legislature, Second Special Session speak directly to problems experienced by *pro se* debtors before this Court, and although § 78–9–102 was repealed May 3, 2004, it provides meaningful guidance with respect to the legislative intent and direction in which Utah law may evolve in the future. Section 78–9–102 was likely repealed because it defined the unauthorized practice of law too narrowly. If § 78–9–102 were the law, the services provided by Aaronson Grand and hosts of other non-attorney professionals would safely fall outside the definition of the unauthorized practice of law. As found by the Utah State Legislature, in many situations, non-attorney professionals now provide, at low cost to consumers with adequate protections, services previously reserved by law to attorneys. The state of the law in this area has evolved and traditional notions of what is and what is not the unauthorized practice of law must be evaluated in light of the legislature's findings that recognize the reality of today's social, economic and business climate. Necessary services that were previously reserved only to attorneys are now commonly performed by non-attorneys. As a practical matter, it would likely be impossible for attorneys to perform the vast array of services that encroach on the practice of law without increasing the number of attorneys many fold. These are services that are necessary, they are expected and even demanded by the public. Just a few examples of such services are as follows:

Accountants advise their clients with respect to the tax implications of their investment decisions, analyzing the financial and the legal effect of the client's tax deductions, tax credits, amortization schedules, claimed depletion credits, and the like. Tax accountants are viewed as experts with respect to the application of the federal and state tax laws and accountants routinely advising their clients with respect to the tax laws. Accountants appear before this court regularly as professionals. They perform tasks such as preference analysis, liquidation analysis, and insolvency analysis applying the facts to the law and presenting their clients with advice and recommendations consistent with their analysis.

Income tax preparers collect basic information from their clients and in most cases, utilize specialized computer software to transform the client's information into completed federal and state tax returns. Tax preparers deal with a multitude of issues that affect their clients legal rights and obligations under the federal and state tax laws including computation of the client's gross income, dividend income, passive investment income, itemized deductions including the computation of deductible medical expenses, unreimbursed employee expenses, charitable donations, and deductible interest payments. Tax preparers compute their client's tax credits, exemptions, long term and short term capital gains and losses, business gains and losses, depletion allowances, earned income credits, credits for child and dependent care expense, adoption credits, foreign tax credits, taxable and tax-exempt interest, tax penalties for early withdrawal from qualifying pension plans, self employment taxes, and of course they determine and advise the client of the amount and due date of the client's tax obligations or of the amount of the client's federal and state tax refund that is due them.

Realtors prepare documents that, in many cases, represent the single most im-

portant investment of their client's lives. Realtors prepare and deliver offers and counter-offers to buy and sell, they advise their clients with respect to the value of the client's home or the value of the home that the client is considering purchasing. Realtors routinely advise their client with respect to the legal effects of making a written purchase offer, the legal effect of tendering "earnest money" with the offer, the legal effect of making the purchase offer "contingent" upon certain events and the legal effect of waiving contingencies.

Investment Advisors advise their clients with respect to various financial decisions including the legal effect of placing orders such as "puts", "calls", "limit sell orders", "limit buy orders", "commodity transactions" and the legal effect of trading "on the margin". Investment advisors are expected to and do advise their clients with respect to the federal and state tax effects of their investment decisions.

Appraisers advise their clients regarding the marketability and value of property, both real and personal. In so doing, appraisers assign various values to the property depending upon the nature of the property, the proposed use of the property and the legal status of the property, including the legal effect of any zoning laws, easements, covenants or other legal restrictions.

Insurance Agents advise their clients with respect to the client's rights and obligations arising out of the client's insurance policies, including the legal impact of an insured's failure to promptly advise the insurance company of any claim or potential claim. Insurance agents will advise a client with respect to coverage, or the lack of coverage with regard to negligent acts, grossly negligent acts, intentional acts, attractive nuisances, trespasser's claims, etc. Insurance agents advise their clients of the benefits of owning an "umbrella policy",

the legal effect of a policy limit, and the legal effect of the policy's deductible amount.

Personnel Supervisors / Human Resource Supervisors advise employees regarding the employee's legal rights and options with respect to employee health insurance, pension options, employee grievances, federal and state tax withholding obligations, the legal effect of an employee's retirement vesting, the employee's rights if injured on the job, the employees rights if terminated or laid off temporarily, and the employees rights and obligations under COBRA upon separation from employment. They conduct seminars and train supervisors regarding the requirements and ramifications of the sexual harassment laws, age discrimination laws, the Family Leave Act, and the Federal Disability Act. They advise employees regarding various deadlines the effect the employee's rights, and routinely assist employees in the preparation and filing of the numerous forms required of an employee under state and federal law.

Mortgage brokers advise their clients with respect to qualifying and obtaining mortgage financing. They advise their clients about the requirements to qualify for such loans and the legal effects, and the differences between various types of loans such as fixed rate mortgages, variable rate mortgages, balloon notes, and reverse amortization mortgages. Mortgage brokers advise their clients with respect to the client's rights under the Federal Truth in Lending Act, and the legal and financial effect of the clients choice to prepay the mortgage, the assignability or non-assignability of the mortgage, and the tax effect of securing the mortgage with the client's real property.

Credit Card Companies will immediately advise the card user of their rights and obligations with respect to a lost card, and

with respect to disputed charges discovered on the card.

Car Salesmen will freely advise prospective purchasers with respect to the legal effect of financing an automobile purchase. They will advise the purchaser about the Federal Truth in Lending Act, they will explain why a finance company continues to hold title to the automobile after purchase and until the note is paid in full, they will advise the purchaser about the extent and the limitations on the warranty rights purchased with the automobile, and if pressed, will even explain the legal effect of a state's "lemon laws".

Hospitals no longer admit a patient until the patient has first been advised of their legal rights under the Health Information Portability and Privacy Act.

Cell Phone Companies will advise their customers of their legal rights and obligations in the event that a cell phone is lost.

Westlaw, Lois Law, and Lexis provide a wealth of legal information, case law, statutory law, legislative history, treatises, etc to non-attorneys and permit non-attorneys to subscribe to their services.

This Bankruptcy Court permits and enrolls non-attorneys in it's CM–ECF program that permits the retrieval, and the filing of documents with the Court online.

Bankruptcy Software is available in almost any store that sells computer software. In addition, software packages are available to advise and assist the purchaser with respect to all sorts of legal matters. Software that advises and assists the purchaser in the practice of law can be purchased by anyone, attorney or non-attorney alike. This Court can find little

distinction between a bankruptcy petition preparer utilizing specialized bankruptcy software for the preparation of the debtor's schedules and statements, and a retail software package that performs the same function for the debtor on the debtor's home computer.[13]

Without a doubt, § 110 was enacted to protect *pro se* debtors. Congress could have used the opportunity of enacting § 110 to define exactly what constituted the unauthorized practice of law, but it didn't. Instead, Congress left that question to state law. When federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and if no such rulings exist, must endeavor to predict how that high court would rule.[14] Here, this Court believes that the Utah State Supreme Court would find that Aaronson Grand did not engage in the practice of law. In the alternative, the Court believes that because Aaronson Grand closely and/or directly associated itself with an attorney who is licensed to practice law in the state and is on active status, the Utah State Supreme Court would find that Aaronson Grand did not engage in the unauthorized practice of law. *See* Hatch, *supra,* n. 1. For the above reasons, this Court finds that Aaronson Grand did not engage in the practice of law and in the alternative, that Aaronson Grand did not engage in the unauthorized practice of law.

Having found that Aaronson Grand did not engage in the unauthorized practice of law, the Court hastens to point out that it views § 110 of the Code as a powerful deterrent for any bankruptcy petition preparer who is neglectful or in any

---

**13.** The only discernable difference between the two is that the petition preparer cashes a personal check and the software company cashes a royalty check.

**14.** *Johnson v. Riddle,* 305 F.3d 1107 (10th Cir.2002).

way attempts to unfairly take advantage of a *pro se* debtor.[15] Had this Court determined that Aaronson Grand had not acted in good faith or had been even slightly negligent in its choice or use of software, this Court would not hesitate to impose the maximum fines available under § 110. Aaronson Grand was convincing in its presentation that it had done all in its power to comply with the requirements of the Code and Rules. This Court expects nothing less and will not hesitate to use § 110 should any bankruptcy petition preparer stray from that standard.

Accordingly, it is hereby

ORDERED that Aaronson Grand is fined the sum of one dollar for violation of § 110(g)(1); and it is further

ORDERED that the United States Trustee's Motion for Sanctions is denied in all other respects.

---

**15.** *Pro se* debtors should be viewed as particularly vulnerable targets when damages are to be considered. *See Continental Trend Resources, Inc. v. OXY USA Inc.,* 101 F.3d 634 (10th Cir.1996).